## EX PARTE B. L. JOHNSON.

### *No. 3833.   Decided October 24.*

1. **Habeas Corpus—Bail.**—Where on a trial on a *habeas corpus* for bail, after an indictment for murder, it appeared from the testimony that applicant entered the house asking and seeking for the deceased and threatening to kill him, and having found deceased made an assault upon him, striking him over the head with his pistol, and while applicant and deceased were engaged in a scuffle two other parties rushed into the house and perhaps fired the fatal shot which killed the deceased; *held*, that bail was properly refused, notwithstanding the evidence failed to show a conspiracy and acting together between applicant and the other two parties. Under such state of case it would be a strained conclusion that two or more parties would meet at the same time and place, at the dead of night, join in committing the same act, disappear immediately thereafter, and yet not be presumed to have been acting together for a common purpose with a common intent, simply because no witnesses could prove the previously formed design to commit the act, or prove the fact that they fled together as conspirators after the consummation of the act.

2. **Habeas Corpus — Burden of Proof.** — Where one is separately indicted for murder, and the proof shows that others not joined with him or not indicted at all were equally guilty in the commission of the crime, if not the actual perpetrators, it is held that applicant can not complain that the principal facts which inculpate him as a principal offender are not alleged in the indictment, nor that the burden is upon the State to show him to be a principal offender. The burden of proof is upon the applicant to show that he is entitled to bail.

APPEAL from the District Court of Brazoria.  Tried below before Hon. W. H. Burkhart.

Appellant was indicted June 19, 1891, for the murder of one Grant Nash, alleged to have been committed by him on or about the 20th day of September, 1890.  On the 22d day of June, 1891, he applied for and obtained a writ of *habeas corpus* from Hon. W. H. Burkhart, judge of the Twenty-third Judicial District, during the June term of the District Court of Brazoria County, then in session.  The writ of *habeas corpus* was heard in term time, June 22, 1891, by said judge, who after hearing the same refused the applicant bail and remanded him to custody.  On the 2d day of July, 1891, appellant filed his motion for rehearing on said writ of *habeas corpus*, which motion having been heard and overruled by the court applicant prosecutes this appeal.

The judgment refusing bail to this relator is affirmed.

Ann Pitman, the first witness, testified in substance as follows: That Mr. Johnson came to her father's house during the night.  That her father got his lamp, and after lighting it went to the door.  Johnson took the lamp from her father, came in, and asked, "Where is Grant?" (deceased).  I told him Grant was not there.  He took the lamp and pistol and looked under the bed and saw Grant; Grant ran into mamma's bedroom.  After he ran I heard the pistol fire.  Mr. Johnson went in there and caught him (Grant) in the collar, struck him over the head with a pistol, and threw him back into the front room.  After Mr. Johnson threw him back I heard the other pistol fire.  I asked Mr. Johnson not to kill the boy.  He said, "He tried to kill me, and I have come to kill him."

Witness was then asked the following questions, viz:

Q.—Is that the end of your story?  A.—Yes, sir.

Q.—Who fired the pistol?  A.—I do not know.

Q.—Was any one else in the room when the pistol was fired?  A.—There were two other white men standing in the door.  I did not know them.

Q.—Did they both have arms?  A.—Yes; both had pistols.

Q.—Did you see either of them shoot?  A.—No, sir; I was in the other room when the pistol fired.

Q.—Where was Grant when the first shot was fired?  A.—In mamma's room.

Q.—Where was Mr. Johnson when that shot was fired?  A.—He was in the room Grant ran out of.  After the first shot Johnson followed Grant and caught him in the collar and struck him over the head with a pistol.  He threw Grant back into the front room.

Q.—Where was Mr. Johnson when the second shot was fired?  A.—I do not know.

Q.—How long did Mr. Johnson and the other men stay after Grant was killed?  A.—No time.

Q.—Did they go off together? A.—I do not know.

Q.—Do you know Mr. Rawls? A.—I do.

Q.—Did you see him that night? A.—If he was there I did not know it.

Q.—Where was Mr. Johnson at the time Grant was killed? A.—I do not know. The first shot did not hit Grant. At the second shot I was getting out at the window.

Q.—Did you see Mr. Johnson go away? A.—I did not, I was behind the house.

Austin Pitman testified in substance, that relator Johnson was bossing the place they lived on, and was in the habit of coming to witness' house at night. On Saturday night Johnson came and witness was asleep. Witness' wife woke him and said Johnson was calling him. I asked him if that was Mr. Johnson, and he said yes. He asked if I had a match, and not having a match, I went to the door with a piece of fire. He shoved the door open and came in. He asked if Grant (deceased) was in. When I told him I did not know, he went to the bed, looked, and not finding him in it, looked under the bed. Grant was under it, and as Grant ran out from under it Johnson grabbed him. They scuffled into the back room. Witness heard no shooting in the back room. While they were scuffling in the back room a white man came up on the gallery, and when he got up on the gallery he shot once. And when I asked him not to shoot me he ran up to me with his pistol in his hand—held it up over me. By that time Mr. Johnson and Grant had scuffled back into the front room, and then this white man shot him (Grant) and left the house. I do not know who it was, I was so frightened.

The following questions were asked by the State, and the following answers elicited:

Q.—Did Grant have any arms? A.—No, sir.

Q.—Did he hit Johnson? A.—He tried to run.

Q.—Did Johnson have a pistol? A.—Yes, sir.

Q.—Did you see Johnson strike that man? A.—No, sir; I only saw him hold the man in the collar, pulling Grant.

Q.—Did Johnson have hold of him when the other man shot him? A.—Yes, sir.

Q.—Do you know Mr. Rawls? A.—Yes, sir.

Q.—Did you see him there that night? A.—If he was I did not know him.

Q.—After this man shot, what did Mr. Johnson say? A.—Mr. Johnson told me I knew all about it. I said, "No, sir; I know nothing about it."

Q.—How long did he (Johnson) stay there after the man was killed? A.—I think four or five minutes.

Q.—Did he go off with the man who shot Grant? A.—He did not go with him.

Q.—Did he go in the same direction? A.—I do not know which way the men went.

Q.—Did you see anything more of Mr. Johnson that night? A.— I did not.

Harriet Pitman testified in the main substantially to the facts as did Ann Pitman and Austin Pitman. As she ran out of the house after Johnson and Grant commenced scuffling she met the two white men mentioned by the other witnesses coming in, but did not know them. She was out of doors when the last shot was fired. Before she ran out of the house she heard Ann Pitman ask Johnson not to kill the boy, and heard Johnson say, "He (Grant) tried to kill me, and I came to kill him." She said she did not know who did the killing. That the two white men spoken of, after the shooting was over, came out of the house first. Johnson staid but a little while, and after he went witness did not know which way he went.

*F. J. Duff*, for appellant, filed a printed brief and able argument upon two assignments of error, which are as follows: 1. The proof of defendant's guilt not being evident, the court erred in refusing him bail.

2. The indictment charging that the applicant did kill and murder Grant Nash by "shooting him with a pistol," and the proof upon an application for bail showing that the applicant was not the actor and did not do the shooting, the applicant is entitled to bail, and if the State seeks to have this privilege denied him by reason of his being a principal under article 74 of the Penal Code, the burden of proof is on the State to show the act and intent which thus made him a principal offender, and it was error in the court holding that the burden of proof was upon the applicant.

He adopted his second assignment as a proposition, and in addition thereto submitted the following, viz.: "In order to render the applicant guilty as a principal the proof must show a combination of two things, to-wit, the abetting acts and intents. Failing in either of these essentials, the evidence is not such as justifies a court on application for bail in refusing the same." Citing as authorities: Ex Parte Smith, 23 Texas Ct. App., 123; Ex Parte Boyett, 19 Texas Ct. App., 45; Ex Parte Randon, 12 Texas Ct. App., 145; Guffee v. The State, 8 Texas Ct. App., 187.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—The indictment in this case charges the relator alone with the murder of one Grant Nash. Upon the trial for

bail it was developed that other parties were present at the time of and engaged in the killing, and fired the fatal shot while the relator was beating the deceased with a pistol. How the parties reached the domicile of deceased is not shown, nor is it made to appear whether they went there together or each by himself. Appellant knocked at the door, was admitted, pulled out his pistol, and began to hunt for deceased and threatened to kill him. He finally, after searching for deceased, found him under the bed. Deceased, upon his whereabouts being discovered, ran into an adjoining room, where he was met by another party who shot at him. He returned in the direction of the relator, who began inflicting blows upon him with his pistol, and while so doing the third party ran up and shot deceased to death. The relator and the other parties immediately left the premises. The killing occurred at night. On this state of the case the trial court refused bail and the relator appealed to this court.

Appellant contends that the facts do not constitute him a principal offender as to the killing, and inasmuch as he is not jointly indicted with others, and because the particular acts and facts which inculpate him as a principal offender are not alleged in the indictment, that therefore the burden is upon the State to show that he is a principal offender. The burden of proof is upon the appellant to show that he is entitled to bail. Ex Parte Smith, 23 Texas Ct. App., 100. This is equally the case whether the indictment charges the offense severally or jointly against the parties. In such a state of case the allegation will not affect the rule as to the burden of proof, whether the indictment be several or joint. This question was not raised below, because the only evidence adduced was that taken on the examining trial, and upon this evidence the parties rested their case by agreement. Because the facts do not in terms show an actual agreement to kill the deceased, and do not show that the parties to the killing went to and left the place of the homicide in company with each other, we are asked to presume that their meeting there was accidental, and that while there they acted with different intents in committing the homicide, and because appellant did not shoot deceased when he had the opportunity to do so, that therefore he was not a principal offender with the actual slayer. These suggestions are too finely drawn to be based on the facts of the case. It would be a strained conclusion to reach that two or more parties would meet at the same time and place at the dead of night, join in committing the same act, disappear immediately thereafter, and yet not be presumed guilty of acting together, for a common purpose, with a common intent, and in pursuance of a common design, simply because there was no witness who could prove the previously formed design to commit the act or prove the fact that they fled together as conspirators after the consummation of the act. In

such movements there is too much method for accidental theories. We deem it improper to comment upon the facts. The judgment, being correct, is affirmed.

*Affirmed.*

Hurt, J., absent.